EXHIBIT A

STATE OF MINNESOTA — DISTRICT COURT

COUNTY OF GOODHUE — FIRST JUDICIAL DISTRICT

Joseph Schumann,

Plaintiff,

vs.

G4S Secure Solutions (USA), Inc., d/b/a G4S Regulated Security Solutions,

Defendant.

Case Type: Employment Civil
Court File No.: ______________

**SUMMONS**

THIS SUMMONS IS DIRECTED TO DEFENDANT G4S SECURE SOLUTIONS (USA), INC., d/b/a G43 REGULATED SECURITY SOLUTIONS, AND ITS REGISTERED AGENT OF SERVICE, Prentice-Hall Corp. System, Inc., 380 Jackson Street, Suite 700, Saint Paul, Minnesota 55102:

1. **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this Summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

HALUNEN & ASSOCIATES
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612-605-4098
Facsimile: 612-605-4099

3. **YOU MUST RESPOND TO EACH CLAIM**. The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: February 27, 2014

HALUNEN & ASSOCIATES

Barbara J. Felt

Clayton Halunen, Atty. No. 219721
Barbara J. Felt, Atty. No. 228564
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612.605.4098
Facsimile: 612.605.4099

*ATTORNEYS FOR PLAINTIFF*

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF GOODHUE** | **FIRST JUDICIAL DISTRICT**

| | |
|---|---|
| Joseph Schumann,<br><br>Plaintiff,<br><br>v.<br><br>G4S Secure Solutions (USA) Inc., d/b/a G4S Regulated Security Solutions,<br><br>Defendant. | Case Type: Employment<br>Court File No.: _________<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Joseph Schumann ("Plaintiff"), for his Complaint against Defendant G4S Secure Solutions (USA) Inc., doing business as G4S Regulated Security Solutions ("Defendant"), states and alleges as follows:

**PARTIES**

1. Plaintiff is a resident of the City of Red Wing, County of Goodhue, State of Minnesota.

2. Defendant G4S Secure Solutions (USA) Inc. ("G4S") is a foreign corporation, incorporated in the State of Florida, authorized to conduct business and conducting business in the State of Minnesota. At all times material, Defendant G4S had an office at 1717 Wakonade Drive East, in the City of Welch, County of Goodhue, State of Minnesota, and conducted business from that office.

3. Defendant's registered agent in Minnesota is Prentice-Hall Corp. System, Inc., 380 Jackson Street, Suite 700, Saint Paul, Minnesota 55101.

4. G4S Regulated Security Solutions ("RSS') is, on information and belief, a division of G4S, conducting business in the State of Minnesota.

5. On information and belief, Defendant G4S and RSS are North American business units of G4S, PLC, headquartered in Crawley, United Kingdom, the world's leading international security solutions group.

6. Defendant G4S is a leading provider of integrated security solutions in the United States. RSS is a leading provider to customers in the specialized field of commercial nuclear facilities in the United States.

7. At all times material to this action, Defendant was contracted to provide security staffing for Xcel Energy's Prairie Island Nuclear Generating Plant in Welch, Goodhue County, Minnesota, and G4S provided those security services through its division, RSS.

**JURISDICTION AND VENUE**

8. The jurisdiction of this Court is invoked as violations occurred in the State of Minnesota and involve state law.

9. Venue is appropriate because Defendant transacts a substantial amount of business in Minnesota and the facts giving rise to this action occurred within the borders of the State of Minnesota.

**FACTS**

10. Plaintiff Joseph Schumann is an Asian-American man of Thai descent, born in Bangkok, Thailand. Plaintiff immigrated to the U.S. at the age of ten, and is now a U.S. citizen.

11. Plaintiff was hired by Defendant on or about October 27, 2002 as a Security Officer, assigned to provide security services at Xcel Energy's Prairie Island Nuclear Generating Plant ("PING") in Welch, Minnesota.

12. Plaintiff performed his job well, and received positive performance reviews and feedback throughout his employment.

13. During his employment with Defendant, Plaintiff was subjected to a hostile work environment and repeated incidents of harassment and discrimination based on race and national origin, including many derogatory comments about his race and national origin. This included racial slurs, such as being called "Taliban," "towel head," "gook," "chink," "Charlie," Chinaman," Hajji," "Jihad," "porch monkey," and being deliberately referred to as "Mexican," Puerto Rican," "Asian," "Inuit," "Chinese," "Hmong," "Samoan," and "Somalian."

14. Plaintiff's colleagues would also regularly mimic Asian and Hispanic accents when speaking to him.

15. Some of these racial slurs were made in the presence of Defendant's supervisors and managers, several of whom joined in the remarks and laughed rather than correct the conduct.

16. During his employment, beginning in late 2002 and continuing into March 2013, Plaintiff made repeated reports of harassment and discrimination to his superiors, including several of Defendant's security shift captains, security managers, and his Security Project Manager, Robert Erickson.

17. Erickson himself was one of the employees who used derogatory racial comments when referring to Plaintiff, comments that were witnessed by Plaintiff's co-workers.

18. Plaintiff made clear to Erickson that he found such language offensive and wanted it stopped. It did not.

19. Despite repeated reports to Defendant's' management, the offensive language directed at Plaintiff continued unabated throughout his employment.

20. During his employment, Plaintiff also applied for a number of promotions with Defendant for which he was more than qualified.

21. Plaintiff was routinely passed over for such promotions, allegedly because he lacked the necessary experience, yet those promotions were awarded to less experienced white employees.

22. After he was passed over for several promotions, Plaintiff reported to John "Randy" Pullen, then Defendant's Equipment Logistics Manager, that he was experiencing discrimination based on his race and national origin in Defendant's promotion process. Pullen was one of the managers responsible for approving promotions.

23. Following his complaint to Pullen, in 2009, Plaintiff was promoted to a position as Second Lieutenant Security Supervisor for Defendant.

24. In 2011 and 2012, Plaintiff again applied for several promotions with Defendant, including multiple openings for Security Shift Captains. Plaintiff was passed over for these promotions again in favor of less qualified white employees.

25. Plaintiff remained in the position of Lieutenant Security Officer throughout the remainder of his employment.

26. As a Lieutenant Security Supervisor, Plaintiff's job duties included writing reviews and appraisal of officers, handling schedules for staffing level meetings with other department heads for daily shift operations, acting as Site Emergency Communicator (SEC), training of staff, interacting with other managers/site supervisors for daily/weekly operations and support, weapons inspection/maintenance, review of policies/procedures, oversight of shift and personnel, assessing and monitoring alarms and cameras, developing policies and procedures, utilizing computer programs for site activities, disciplinary action write up, handling Surveillance Procedures (SP's), monthly Task Performance Evaluation (TPE's) of officers, initiate work requests, and handling corrective action programs.

27. On Sunday, April 21, 2013, Armed Security Officer ("ASO") Scott Mancuso was reported to have been inattentive on the job at his post at the Secondary Alarm Station ("SAS") at approximately 9:30 a.m. This was witnessed by ASO Jay Kalsbeck, who used his cell phone to make a video recording of Mancuso at that time.

28. During the time in question, Mancuso was under the supervision of Lieutenant Security Supervisor Jordan Eggenberger, a white G4S supervisor, who was then stationed at Secondary Alarm Station and responsible for all personnel located in the Secondary Alarm Station while maintaining vigilance to the work station, including assessing alarms and monitoring cameras.

29. Plaintiff first learned of the allegation that ASO Mancuso had been inattentive more than three hours later when, at approximately 12:45 p.m., his rounds brought him to the Secondary Alarm Station. Plaintiff was involved in a conversation with ASO Bruce Walker when ASO Adam Rudawski, approached them, laughing, and asked if they had seen "the video."

30. A few minutes later, Plaintiff inquired further of Rudawski about his comment and learned that another ASO, Jay Kalsbeck, claimed to have a cell phone video showing ASO Mancuso with his eyes closed at his SAS post during his shift earlier that day.

31. Plaintiff had been in contact with Mr. Mancuso several times earlier that day during his rounds and hourly radio checks and had not observed anything to suggest that Mancuso had been tired or inattentive. Moreover, the Security Supervisors post checks and hourly radio checks of ASO Mancuso had all been satisfactory that day, both before and after the alleged inattentiveness.

32. Further, G4S Lieutenant Security Supervisor Eggenberger had been present at the SAS work station at the time of the incident in question and, during that time, Eggenberger was

in charge of all personnel in SAS for attentiveness under the site/company policy Behavioral Observation Program.

33. Plaintiff began to investigate this allegation in accord with Defendant's policies and procedures, first seeking to confirm the information that he had heard, and then interviewing those officers who apparently had knowledge about the situation. Plaintiff also reviewed the policies and procedures applicable under the circumstances. Plaintiff did this while continuing to handle immediate security responsibilities including alarms that came in on a side door.

34. After obtaining verification of the allegation against Mancuso, Plaintiff reported this information to his supervisor, Security Shift Supervisor Captain Daniel Strauss. This was approximately one hour after Plaintiff had first heard ASO Rudawski make reference to a video.

35. Subsequent to his report to Strauss, Plaintiff spoke with ASO Kalsbeck and was able to view the video recording, which did appear to confirm that ASO Mancuso had been briefly inattentive on the job.

36. On April 26, 2013, Defendant suspended Plaintiff from work without pay, at a meeting with Project Manager Robert Erickson and Brent Burress (G4S investigating representative). Xcel Access Coordinators Randy Cleveland and Patrick Hocke were also in attendance. When Plaintiff asked why he was being suspended, he was told that they could not tell him why, but that he would be suspended pending an investigation. Plaintiff was not given a reason for his suspension.

37. On April 29, 2013, Plaintiff contacted Paul Zurawski, the U.S. Nuclear Regulatory Commission (NRC) Resident Inspector at Prairie Island Nuclear Generating Plant. Plaintiff asked the NRC to investigate this incident, his suspension, and how Defendant was

handling the matter in a discriminatory manner. Plaintiff was advised that his report was protected activity and his name would not be disclosed.

38. On May 3, 2013, Plaintiff met with NRC investigator Jay Bigoness at the Prairie Island Training Center, who questioned him about the incident at issue. Plaintiff also reported his concerns about disparate treatment and the potential of future retaliation from Defendant due to his report to the NRC.

39. Also on May 3, 2013, Plaintiff called Project Manager Robert Erickson for an update on his suspension, and again asked for the reason for his suspension. Erickson refused to provide Plaintiff with any information, except to advise him that a G4S attorney would be calling him.

40. When Defendant's attorney, Dan Schwarz, contacted Plaintiff two days later, he solely questioned Plaintiff about what Plaintiff had reported to the NRC – information that should not then have been known to Defendant. Mr. Schwarz also called Plaintiff on subsequent dates with further questions, and warned Plaintiff to stop calling other managers at G4S with questions.

41. On May 8, 2013, Plaintiff again contacted the NRC and spoke with Nate Egan, NRC Physical Security Inspector. Plaintiff again reported the situation that led to his suspension, as well as his concerns about ongoing harassment and discrimination, and the retaliatory actions being taken by Defendant.

42. Plaintiff again spoke with the NRC on or about May 21, 2013, speaking with Nate Egan and Jim Heller, NRC Region III Office Allegation Coordinator, and he again reported his concerns about the hostile work environment, retaliation and disparate treatment directed at him by Defendant. During this call, the NRC asked Plaintiff if they could disclose his identity to

Defendant and Xcel in their upcoming meeting with them about the Mancuso situation that Plaintiff had reported. Plaintiff agreed that the NRC could use his name for investigation purposes.

43. By letter dated May 29, 2013 from James Heller, the NRC advised Plaintiff that it had determined that he had provided enough evidence of discrimination (site access badge pulled and Plaintiff's employment may be terminated) for reporting a safety concern to security management, thus warranting an investigation of his discrimination reports.

44. Throughout this time, Plaintiff remained on suspension, and had still not been given a reason for his suspension.

45. On June 14, 2013, Plaintiff received a call and was instructed to meet his manager, Robert Erickson, in the parking lot of a local bar. When Plaintiff arrived there, Erickson handed him a letter stating that he was terminated from his employment.

46. In that letter, Defendant stated that the reason for Plaintiff's termination was that he had violated Xcel Site Policy SE0025 – Conduct of Security Operations, and that he had not properly handled time-critical decisions. Defendant further stated that Plaintiff violated G4S Policy WPO 1308, Progressive Discipline Plan.

47. On information and belief, white employees who failed to immediately report this incident, including Lieutenant Eggenberger who was the supervisor over ASO Mancuso at the time in question, as well as ASO Rudawski and ASO Walker, were not suspended or terminated due to this incident. On information and belief, these white employees remain employed by Defendant.

48. Plaintiff was terminated because he made repeated reports to Defendant and the NRC that he was the target of discriminatory and retaliatory conduct by Defendant.

49. Defendant's stated reason for Plaintiff's termination is pretext.

50. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, loss of wages and benefits, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, and has incurred attorneys' fees and expenses and other serious damages.

**CLAIMS**

**COUNT ONE**

**VIOLATIONS OF THE MINNESOTA WHISTLEBLOWER ACT**

Plaintiff realleges each and every paragraph of this Complaint.

51. The Minnesota Whistleblower Act ("MWA") prohibits retaliation against employees for making good-faith reports of violations of law. Minn. Stat. § 181.932, Subd. 1 provides:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) the employee ..., in good faith, reports a violation, or suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;
>
> (2) the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;
>
> (3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason.

52. Plaintiff reported what he reasonably and in good faith believed to be violations of federal or state law or common law or rule adopted pursuant to law to his employer, Defendant G4S, and the NRC. Plaintiff's reports include, but are not limited to, that he was

experiencing retaliation after he reported a G4S violation of NRC rules and regulations pertaining to the attentiveness required of security force employees both to Defendant and to the NRC.

53. The laws which Plaintiff believed Defendant violated include, but are not limited to, Section 211 of the Energy Reorganization Act of 1974, 42 U.S.C. §5851; NRC Regulations at 10 CFR §50.7; and other NRC anti-retaliation policies, including those set forth in NRC Policy Statements and the Federal Register.

54. Defendant retaliated against Plaintiff as a result of his reported complaints by placing him on suspension and ultimately terminating his employment.

55. The adverse employment actions as alleged herein constitute violations of the MWA, Minn. Stat. §§ 181.931 *et seq.*

56. The unlawful employment practices complained of above were intentional and were performed by Defendant with malice and/or with reckless indifference to the laws that protect Plaintiff.

57. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## COUNT TWO
## RACE AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff realleges each and every paragraph of this Complaint.

58. Defendant, through its managers and officials acting on its behalf and within the scope of their employment, engaged in unlawful race and national origin discrimination against

Plaintiff in violation of Minn. Stat. §§ 363A.01 *et seq.* by subjecting him to adverse, differential and discriminatory treatment because of his race and national origin.

59. Defendant's discrimination against Plaintiff included, but is not limited to, repeated racial slurs and comments directed at him throughout his employment by both his co-workers and by Defendant's managers; Defendant's failure to promote Plaintiff to positions for which he was well-qualified, which were then awarded to less qualified white employees; and Defendant's discriminatory termination of Plaintiff.

60. Defendant provided pretextual reasons for Plaintiff's termination. On information and belief, other similarly situated employees have not been disciplined in similar or more egregious situations.

61. Defendant failed to take all reasonable steps to prevent discrimination against Plaintiff from occurring, and failed to correct that conduct when it occurred.

62. Defendant's actions adversely affected the terms, conditions and privileges of Plaintiff's employment.

63. Plaintiff's race and national origin were motivating factors behind Defendant's decision to terminate Plaintiff.

64. The effect of the practices complained of above deprived Plaintiff of equal employment opportunities and otherwise affected his status as an employee because of his race and national origin.

65. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other damages.

**COUNT THREE**
**REPRISAL DISCRIMINATION**
**IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

Plaintiff realleges each and every paragraph of this Complaint.

66. Defendant, through its managers and officials acting on behalf of the Defendant and within the scope of their employment, engaged in unlawful employment practices involving Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 et. seq. These practices include, but are not limited to, terminating Plaintiff's employment.

67. Plaintiff was retaliated against in the terms, conditions and privileges of his employment when he was terminated from his position after he complained to Defendant and the NRC that he was experiencing harassment and discrimination on the job based on his race and national origin.

68. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee.

69. The unlawful employment practices complained of above were intentional and were performed by Defendant with malice or reckless indifference to anti-discrimination laws that protect Plaintiff.

70. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

a. That the practices of Defendant complained of herein be adjudged, decreed, and declared to be in violation of the rights secured to Plaintiff by state law.

b. That Defendant be required to make Plaintiff whole for its adverse, retaliatory, and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor.

c. That Plaintiff be awarded front pay and the monetary value of any employment benefits he would have been entitled to as an employee of Defendant.

d. That Plaintiff be awarded compensatory damages in an amount to be determined at trial.

e. That Plaintiff be awarded punitive damages as permitted by statute.

f. That the Court award Plaintiff his attorneys' fees, costs, and disbursements pursuant statute.

g. That the Court grant such other and further relief as it deems fair and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

Dated: February 27, 2014

HALUNEN & ASSOCIATES

Barbara J. Felt

Clayton D. Halunen #219721
Barbara J. Felt #228564
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099

*ATTORNEYS FOR PLAINTIFF*