## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JOSEPH SCHUMANN,

        Plaintiff,

v.

                                    **MEMORANDUM OF LAW & ORDER**
                                    Civil File No. 14-865 (MJD/HB)

G4S SECURE SOLUTIONS (USA) INC.,
doing business as G4S Regulated Security
Solutions,

                Defendant.

Clayton D. Halunen, Barbara Jean Felt, and Stephen M. Premo, Halunen Law,
Counsel for Plaintiff.

Brian T. Benkstein, Jennifer A. Nodes, and Gina K. Janeiro, Jackson Lewis PC,
Counsel for Defendant.

## I.  INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary

Judgment.  [Docket No. 20]  The Court heard oral argument on January 22, 2016.

Because there are genuine questions of material fact, the Court denies

summary judgment on the discrimination and reprisal claims.  Because the

recommendation to terminate Plaintiff was made before the U.S. Nuclear

Regulatory Commission began its investigation and there is no other evidence to

support a finding of pretext, the Court grants summary judgment on the

whistleblower claim.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Parties

Plaintiff Joseph Schumann is an Asian-American man who was born in

Thailand.  (Schumann Dep. 78.)

Defendant G4S Secure Solutions (USA) Inc. ("G4S") provided security to

Xcel Energy ("Xcel") for its Prairie Island Nuclear Generating Plant ("Prairie

Island") until December 31, 2013.  (Compl. ¶ 6; Ans. ¶ 6; Eggenberger Dep. 8-10.)

The G4S chain of command, from lowest to highest, is: Watchman, Security

Officer, Second Lieutenant, First Lieutenant, Captain, Security Operations

Supervisor, and Project Manager.  (Eggenberger Dep. 22-23.)

In October 2002, G4S hired Schumann as a Security Officer.  (Schumann

Dep. 5-6; Compl. ¶ 11; Ans. ¶ 11.)  G4S assigned Schumann to Prairie Island.

(Id.)

### 2.    Promotions

In 2009, G4S promoted Schumann to Second Lieutenant, which included supervisory responsibilities.  (Schumann Dep. 8-12.)  As a result of the promotion, Schumann was no longer a member of the union.  (Id. 11-12.)

In 2011, G4S promoted Schumann to First Lieutenant.  (Schumann Dep. 15, 17.)  He was assigned to Alpha Team, and Captain Dan Strauss was his direct supervisor.  (Id. 16-18.)  Beginning in 2012, Strauss reported to Project Manager Robert Erickson.  (Erickson Dep. 9.)  Schumann was the only employee of Alpha Team who was not white.  (Eggenberger Dep. 67.)  Schumann received positive performance reviews throughout his employment with G4S.  (Felt Decl., Exs. 2-4.)

### 3.    Racial Slurs

Schumann was subjected to slurs based on his race and national origin throughout his entire employment with G4S from 2002 until 2013.  Both coworkers and supervisors made slurs, laughed at slurs, and failed to take actions on slurs of which they were aware.  Schumann was called "porch monkey," "towel head," "Taliban," "Somalian," "Mexican," "Hispanic," "Charlie," "Jap," "chink," "gook," "Samoan," "Inuit," and "Hajji."  (Schumann

Dep. 82, 87-88, 90, 256-259; Rudawski Dep. 66.)  During training, some of

Schumann's coworkers affected Asian and Hispanic accents when they spoke

about him.  (Walker Dep. 171-72.)  On multiple occasions, when Security Officer

Nhia Xiong did a radio transmission, other G4S employees keyed in and imitated

what Xiong said in an Asian accent.  (Walker Dep. 172-74.)

### 4.    Schumann's Reports of Harassment to Erickson

Erickson used racial comments when referring to Schumann, repeatedly

referring to him as "Mexican" or "Puerto Rican," even though Schumann told

Erickson that he was Asian.  (Schumann Dep. 93-96.)  Erickson continued the

racial comments even after he had been promoted to Project Manager,

continuing through February 2013.  (Id. 95-96, 100.)  Schumann told him to stop.

(Id. 94.)

Schumann reported racial harassment to Erickson multiple times.

(Schumann Dep. 93.)  In February 2013, Schumann asked Erickson to talk with

other managers and ask them to refer to him by his name rather than with racial

references.  (Id. 99-100.)  In March 2013, Schumann met with Erickson and told

him about the specific racial slurs being directed at him on his shift.  (Id. 93-94,

97.)  In both the February and March meetings, Erickson changed the subject and

falsely accused Schumann of having a relationship with a female coworker.  (Id. 97-100.)

### 5.    Security Policies

Schumann was aware of G4S's Incident Investigation Policy and Procedure and knew that he had to comply with it.  (Schumann Dep. 229.)  It stated: "Security force members are responsible and obligated to immediately report any incident to shift supervision, and if applicable, assume appropriate compensatory measures."  (Benkstein Decl., Ex. F at ¶ 3.3.)  The policy provided: "Incidents are defined as any performance failure or misconduct on the part of [] employees.  Examples of some of the incidents that may be considered for investigation include: . . . Inattentiveness . . . ."  (Id. at ¶ 2.1.)

Schumann also knew that he needed to follow Prairie Island's Fitness for Duty ("FFD") Program, that it required personnel to be fit for duty, and that fitness could be affected by fatigue.  (Schumann Dep. 152-55; Benkstein Decl., Ex. G, Xcel Energy Monticello/Prairie Island FFD Program.)  The FFD Program provided that, when "there is reason to believe the Nuclear FFD Policy is being violated . . . Xcel Energy and contractor supervisors of suspected personnel SHALL be notified."  (Schumann Dep. 155; FFD Program ¶ 5.2.3.)

Schumann was also aware that Prairie Island had an FFD Handbook, which stated:

> Workers who question the fitness of others (e.g., co-workers, visitors, supervisors) SHALL report their concerns and/or observations to their supervisor or manager.  Supervisors and managers may temporarily restrict or modify work assignments accordingly.

(Schumann Dep. 157-59; Benkstein Decl., Ex. H, FFD Handbook at 6, ¶ 4.1.)  The FFD Handbook provided that it applies to "[a]ll personnel granted unescorted access to the nuclear plants (badged personnel)" and further directed supervisors to use their "professional judgment when using the guidelines."  (Felt Decl., Ex. 18, FFD Handbook at 4, 40.)

## 6.    The Mancuso Incident

On Sunday, April 21, 2013, Security Officer Scott Mancuso was stationed in the Secondary Alarm Station ("SAS") with Security Officer Jay Kalsbeck.  (Felt Decl., Ex. 24; Eggenberger Dep. 39-40, 43-44.)  At 9:37 a.m., Second Lieutenant Jordan Eggenberger logged in as the supervisor in charge of SAS.  (Eggenberger Dep. 43-44; Schumann Dep. 215-16; Felt Decl., Ex. 7.)

At approximately 9:39 a.m., Kalsbeck used his cell phone to record a video of Mancuso nodding off at his security post.  (Felt Decl., Ex. 24; Felt Decl., Ex. 8.)

Kalsbeck recorded Mancuso for approximately 40 seconds.  (Erickson Dep. 137.)

(The parties refer to this event as the "Mancuso Incident.")

Eggenberger testified that he did not witness Kalsbeck make the recording

and he did not observe Mancuso nod off.  (Eggenberger Dep. 48-49.)

Eggenberger was seated in front of a console with his back to Mancuso and

Kalsbeck; they were all in a room that was no bigger than 10 feet by 15 feet.

(Eggenberger Dep. 44-48.)  Kalsbeck did not tell Eggenberger that Mancuso was

inattentive.  (Id. 50-51.)

At 11:31 a.m., Schumann rotated into SAS, taking over as the supervisor in

charge from Eggenberger.  (Felt Decl., Ex. 7.)  At approximately 12:45 p.m.,

Security Officer Adam Rudawski rotated into SAS and approached Security

Officer Bruce Walker and asked Walker if he had seen "a video."  (Schumann

Dep. 49-51; Rudawski Dep. 57-58, 72.)  Schumann heard the beginning of their

conversation, during which Rudawski was laughing about a video.  (Schumann

Dep. 49-51.)  At that moment, an alarm went off, and Schumann turned to

address the alarm issue and his monitors.  (Id. 50-52.)  After the alarm was

cleared, Schumann turned back to Rudawski and asked him what they were

laughing about.  (Id.)  Rudawski told him that Mancuso had been seen nodding

off at his post earlier that day and that it had been recorded by Kalsbeck.  (Id.)

Schumann had been in contact with Mancuso several times that day and

did not think that he had observed or heard anything to suggest that Mancuso

had been tired or inattentive.  (Schumann Dep. 57.)  Schumann knew that

Eggenberger had been the supervisor stationed at SAS with Mancuso at the time

of the incident.  (Id.)

After Schumann spoke to Walker and Rudawski, he accessed the

Sharepoint database to review the Fitness for Duty requirements and related

guidelines.  (Schumann Dep. 56; Felt Decl., Ex. 18.)  The materials were

voluminous, so it took him some time to locate and review the relevant

information while he was still handling his assigned security operations.

(Schumann Dep. 59.)  After he had reviewed the materials, he was due to rotate

from SAS to the Central Alarm Station ("CAS").  Schumann knew that Strauss

was stationed in CAS and that he would be able to discuss the allegations with

Strauss there.  (Id. 58.)

Lieutenant Dale Minder replaced Schumann in SAS at 1:41 p.m., and

Schumann signed into CAS at 1:51 p.m.  (Felt Decl., Ex. 7.)  Based on the distance

and having to go through three security doors, the rotation from SAS to CAS

generally takes 5 to 8 minutes.  (Schumann Dep. 64-66.)  Schumann recalls that he

may have stopped to use the bathroom and may have picked up his lunch to

bring with him to CAS.  (Id. 65, 140-41, 146.)

As soon as Schumann completed the turnover with the departing CAS

operator, he reported to Strauss what he had heard about potential

inattentiveness by Mancuso.  (Schumann Dep. 66-67.)  It was approximately 45

minutes after Schumann had first learned about the video.  (Id. 66-67, 71; Felt

Decl., Exs. 8-9.)

Schumann and Strauss referred to and discussed the relevant procedures.

(Schumann Dep. 58-61.)  Strauss instructed Schumann to call Kalsbeck to come

up to CAS so they could jointly view the video.  (Id. 60.)  Schumann's and

Strauss's review of the recording confirmed that Mancuso appeared inattentive

for a brief period of time.  (Id. 60-61.)

Strauss contacted Xcel's Access FFD Program Manager, Randy Cleveland,

at 2:48 p.m.  (Felt Decl., Ex. 8 at 2; Strauss Dep. 91; Cleveland Dep. 10.)  He also

contacted the Prairie Island Fatigue Rule Administrator.  (Strauss Dep. 91-92.)

Strauss then called Erickson at 2:52 p.m.  (Strauss Dep. 96, 104; Felt Decl., Ex. 8 at

2.)   On April 22, 2013, Prairie Island security management notified the U.S.

Nuclear Regulatory Commission ("NRC") of the Mancuso Incident.  (Felt Decl.,

Ex. 12, at JS 185; Felt Decl., Ex. 20 at G4S 712.)

### 7.   Schumann's Suspension

On April 26, 2013, Erickson and G4S investigating representative Brett

Burris interviewed Schumann and then suspended him from work pending

investigation.  (Schumann Dep. 147-48.)  That same day, Xcel revoked

Schumann's access to Prairie Island.  (Id. 170-71.)  Both G4S and Xcel then

conducted investigations of the Mancuso Incident.

### 8.   Schumann's Report to the NRC

On April 29, 2013, Schumann called Paul Zurawski, NRC Resident

Inspector at Prairie Island.  (Felt Decl., Ex 12 at 1.)  Schumann asked Zurawski to

investigate the Mancuso Incident and whether Schumann was being

discriminated against.  (Id.)  The NRC began its investigation on May 2, 2013.

(Feld Decl., Ex. 20 at 1.)  Schumann claims that he met with an NRC investigator

on May 3, 2013.  Schumann did not tell anyone at G4S that he had contacted the

NRC.  (Schumann Dep. 263.)

On May 5 and 6, a G4S attorney called Schumann, asked him what he had told the NRC, and told him to stop calling other managers at G4S.  (Schumann Dep. 188-91, 263.)

### 9.    Schumann's Termination

On April 29, 2013, Erickson sent an email to Gene Kuyrkendall, G4S Senior Director of Nuclear Operations.  (Felt Decl., Ex. 17, Employee Termination Review.)  Attached to the email was an Employee Termination Review form, in which Erickson recommended terminating Schumann based on his failure "to make notifications and take action of a possible fatigue issue in a reasonable time."  (Id.)

The final Employee Termination Review form was signed by Erickson and Kuyrkendall on May 3, 2013, and by additional management on May 9 and May 20.  (See Felt Decl., Ex. 13 at 2.)  The form states that Schumann is being terminated for failure "to make notifications and take action of a possible fatigue issue in a reasonable time."  (Id.)

G4S could not immediately notify Schumann of its termination decision because Prairie Island's investigation and Xcel's Material Employee Action Review ("MEAR") were still pending.  As a contractor, G4S was required to

submit its termination decision to MEAR.  (Cleveland Dep. 43-44.)  One of the

purposes of MEAR is to verify that the employment decision does not constitute

reprisal against an employee for raising a safety concern.  (Id. 46-47, 70.)

Ultimately, Xcel concluded that Schumann's termination was permitted.

(Benkstein Decl., Ex. N.)

On June 14, 2013, Erickson met with Schumann and handed him a letter

stating that he was being terminated for failing to timely report the Mancuso

Incident.  (Schumann Dep. 171-72; Benkstein Decl., Ex. P.)

### 10.   Discipline of Other G4S Employees Involved in the Mancuso Incident

On June 17, 2013, G4S terminated Mancuso for being inattentive on the job

and Kalsbeck for failing to report Mancuso's inattentiveness and for taking video

of security personnel without permission.  (Felt Decl., Exs. 10-11.)  Rudawski was

not disciplined.  (Rudawski Dep. 46-48.)

### B.   Procedural History

On February 27, 2014, Schumann commenced a lawsuit against G4S in

Goodhue County District Court.  The Complaint asserts: Count 1: Violations of

the Minnesota Whistleblower Act ("MWA"); Count 2: Race and National Origin

Discrimination in Violation of the Minnesota Human Rights Act ("MHRA"); and

Count 3: Reprisal Discrimination in Violation of the MHRA.

On March 28, 2014, G4S removed the matter to this Court based on

diversity jurisdiction.  G4S now moves for summary judgment on all claims

against it.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

Plaintiff notes that he only asserts three claims: race and national origin

discrimination under the MHRA based on his termination; MHRA retaliation;

and a claim under the MWA.  He does not assert a failure to promote claim or a

hostile work environment claim.  (See [Docket No. 29] Opp. at 18.)

## B.    Race and National Origin Discrimination

### 1.    Race and National Origin Discrimination Standard

Race and national origin "[d]iscrimination, hostile work environment, and

retaliation claims under Title VII and the MHRA are governed by the same

standards." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1015 n.3 (8th Cir. 2011). See also

Wayne v. MasterShield, Inc., 597 N.W.2d 917, 921 (Minn. Ct. App. 1999).

> The MHRA provides that

> it is an unfair employment practice for an employer, because of race
> . . . [or] national origin . . . to: . . . discharge an employee; or []
> discriminate against a person with respect to hiring, tenure,
> compensation, terms, upgrading, conditions, facilities, or privileges
> of employment.

Minn. Stat. § 363A.08, subd. 2.

Disparate treatment claims under the MHRA can be proven under the

McDonnell Douglas burden-shifting framework or under the direct evidence

framework.  Friend v. Gopher Co., 771 N.W.2d 33, 37 (Minn. Ct. App. 2009).

Here, Schumann argues under the McDonnell Douglas framework.

> To establish a prima facie case of discrimination, a plaintiff
> must show (1) he is a member of a protected class, (2) he met his
> employer's legitimate expectations, (3) he suffered an adverse

employment action, and (4) the circumstances give rise to an inference of discrimination.

Pye, 641 F.3d at 1019 (citations omitted).

> [T]he plaintiff initially has the burden to establish a prima facie case of discrimination.  A prima facie case creates a rebuttable presumption of discrimination.  The burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision.  If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination.

Id. (citation omitted).

### 2.      Prima Facie Case

For the purposes of this motion, G4S admits that Schumann meets the prima facie case.

### 3.      Legitimate Non-Discriminatory Reason

G4S has set forth a legitimate non-discriminatory reason for terminating Schumann: it terminated Schumann because he failed to timely report the Mancuso Incident to his supervisor.

### 4.      Pretext

The Court concludes that Schumann has raised a material question of fact regarding pretext through evidence regarding similarly situated white

employees receiving more lenient treatment and through evidence of ongoing racial animus.

First, Schumann has raised a fact question regarding whether G4S treated similarly situated white employees more favorably. G4S is correct that Schumann cannot point to another supervisor who knew of the Mancuso Incident, failed to report the incident for approximately 45 minutes, and was not fired. However, "[t]he similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." Ridout v. JBS USA, LLC, 716 F.3d 1079, 1085 (8th Cir. 2013) (citation omitted). Like Schumann, Eggenberger was a supervisor involved in the Mancuso Incident. Eggenberger, who is white, was the supervisor in charge of SAS at the time that Mancuso was inattentive and Kalsbeck breached regulations by recording at the facility. SAS is a small room. The Mancuso Incident occurred only 2 minutes after Eggenberger assumed supervisory authority over SAS, and Eggenberger had an obligation to assure that all of his staff were fit for duty and in compliance with regulations, yet he failed to notice that Mancuso was inattentive and that Kalsbeck was filming Mancuso. Eggenberger was not terminated, disciplined, or even

16

interviewed for the G4S investigation.  (See Eggenberger Dep. 10, 110; Felt Decl., Ex. 25 at 16-17.)

Schumann also points to Security Officer Rudawski, who is white.  All G4S employees, not just supervisors, were obligated to comply with site FFD policies and promptly report any FFD concerns.  Schumann was terminated for not reporting a possible FFD allegation to his supervisor for approximately 45 minutes.  But Rudawski had seen the video that showed Mancuso was inattentive on the job, and Rudawski was not disciplined for failing to report the issue promptly.  He did not tell any supervisor until he told Schumann, more than 2 hours later.  (Felt Decl., Ex. 8.)  Rudawski was not even interviewed for the G4S investigation.  (See Felt Decl., Ex. 25 at 16-17.)  Neither Eggenberger nor Rudawski are Schumann's "clones," but their circumstances are close enough to raise a fact question as to pretext.

Second, Schumann has presented evidence that G4S coworkers, including supervisors and even Erickson, who was a decisionmaker regarding Schumann's termination, repeatedly referred to Schumann with racial slurs.  He also points out that coworkers publicly mocked both Schumann and Xiong with Asian accents.  These pervasive comments, at a minimum, "constitute circumstantial

17

evidence that, when considered together with other evidence, may give rise to a

reasonable inference of [] discrimination." <u>Fisher v. Pharmacia & Upjohn</u>, 225

F.3d 915, 923 (8th Cir. 2000).   "In a pretext case, [] such comments are surely the

kind of fact which could cause a reasonable trier of fact to raise an eyebrow, thus

providing additional threads of evidence, that are relevant to the jury." <u>Bevan v.</u>

<u>Honeywell, Inc.</u>, 118 F.3d 603 (8th Cir. 1997) (citations omitted).

Combining the evidence of G4S's treatment of Eggenberger and Rudawski

with the volume of racial slurs directed at and about Schumann, the Court

concludes that Schumann has met his burden as to pretext.

### C.    Retaliation

#### 1.    Retaliation Standard

Under the MHRA,

> [i]t is an unfair discriminatory practice for any individual who
> participated in the alleged discrimination as a[n] . . . employer . . . to
> intentionally engage in any reprisal against any person because that
> person [] opposed a practice forbidden under this chapter or has
> filed a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this chapter . . . .

Minn. Stat. § 363A.15, subd. 1.

"To defeat summary judgment on a retaliation claim, a plaintiff must

produce either direct evidence of retaliation, or create an inference of retaliation

under the <u>McDonnell Douglas</u> burden-shifting framework." <u>Pye</u>, 641 F.3d at

1020 (citations omitted).  Under the <u>McDonnell Douglas</u> framework,

> an employee has the initial burden of establishing a prima facie case
> of retaliation by showing that (1) he engaged in protected conduct,
> (2) he suffered a materially adverse employment action, and (3) the
> adverse action was causally linked to the protected conduct.  If an
> employee establishes a prima facie case of retaliation, the burden
> shifts to the employer to articulate a legitimate, non-retaliatory
> reason for its action; if the employer does so, the burden then shifts
> back to the employee to put forth evidence of pretext, the ultimate
> question being whether a prohibited reason, rather than the
> proffered reason, actually motivated the employer's action.

<u>Id.</u> at 1021 (citations omitted).

### 2.    Prima Facie Case

For the purposes of this motion, G4S concedes that, to the extent that

Schumann's claim is based on his reports of discriminatory conduct and racial

slurs to Erickson in February and March 2013, Schumann has met his prima facie

case.

### 3.    Legitimate Non-Discriminatory Reason

G4S has set forth a legitimate non-discriminatory reason for terminating

Schumann: it terminated Schumann because he failed to timely report the

Mancuso Incident to his supervisor.

### 4.      Pretext

Schumann asserts that, in February and March 2013, he complained to

Erickson about the discriminatory conduct and racial slurs and asked Erickson to

make it stop.  G4S suspended Schumann from active duty on April 26, 2013;

Erickson made a written recommendation to terminate Schumann on April 29,

2013; and Erickson signed Schumann's termination on May 3, 2013.  The

temporal proximity between Schumann's protected conduct and his termination

supports a finding of pretext.  As the Court explained with respect to the

discrimination claim, Schumann has also set forth evidence that similarly

situated G4S employees who did not engage in protected conduct were treated

more favorably.  Additionally, the G4S environment was pervaded with racial

comments toward and about Schumann.  Erickson, himself, used racial terms to

describe Schumann, and Erickson was involved in the decision to terminate

Schumann a month or two after Schumann made complaints to Erickson.

Schumann has met his burden regarding pretext.

### D.      MWA Claim

### 1.      Standard for MWA Claim

Under Minnesota Statute § 181.932, subdivision 1,

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official . . . .

The Court applies the <u>McDonnell Douglas</u> analysis to Schumann's whistleblower claim.  <u>Cokley v. City of Otsego</u>, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).

[T]he employee has the initial burden to establish a prima facie case, and the burden of production then shifts to the employer to articulate a legitimate, non-retaliatory reason for its action, after which the employee may demonstrate that the employer's articulated reasons are pretextual.  At all times the employee has the burden to prove by a preponderance of evidence that the employer's action was for an impermissible reason.

<u>Id.</u> (citations omitted).  "[E]ven if an employer has a legitimate reason for the discharge, a plaintiff may nevertheless prevail if an illegitimate reason more likely than not motivated the discharge decision."  <u>McGrath v. TCF Bank Sav., FSB</u>, 509 N.W.2d 365, 366 (Minn. 1993) (citations omitted).

In order to establish his prima facie case, Schumann "must show: (1) statutorily-protected conduct by the employee; (2) adverse employment action

by the employer; and (3) a causal connection between the two." <u>Cokley</u>, 623

N.W.2d at 630 (citation omitted).

### 2.      Prima Facie Case

In his MWA claim, Schumann asserts that he was fired in retaliation for

reporting the Mancuso Incident to the NRC.  For the purpose of this motion, G4S

concedes that Schumann meets the prima facie case.

### 3.      Legitimate Non-Discriminatory Reason

G4S asserts that it terminated Schumann for failing to report the Mancuso

Incident in a timely manner.

### 4.      Pretext

The Court holds that Schumann cannot show a material question of fact as

to pretext.  Schumann asserts that timing supports a finding of pretext; however,

the timing is insufficient to raise a question of material fact.  G4S suspended

Schumann on April 26.  On April 29, Schumann called Zurawski to lodge a

complaint with the NRC.  Also on April 29, Erickson recommended, in writing,

Schumann's termination based on the Mancuso Incident.  Erickson avers that, on

April 29, he had no knowledge of Schumann's communications with the NRC

(Erickson Decl. ¶ 2), and Schumann does not claim otherwise.  Schumann

testified that he told no one at G4S that he had called the NRC.  The NRC began

its investigation on May 2.  Schumann claims that he met with an NRC

investigator on May 3.  Erickson signed Schumann's final termination papers on

May 3.  Thus, the NRC did not even open an investigation until May 2, 2013,

after Erickson had already recommended termination.  Schumann points to no

evidence that G4S knew of his complaint to the NRC before May 2.  Based on the

timing, there is no evidence that G4S's knowledge of the NRC investigation

caused it to terminate Schumann.  Moreover, Schumann points to no other

evidence that ties his report to the NRC to G4S's decision to terminate him.  In

fact, the Mancuso Incident had already previously been reported to the NRC on

April 22.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment [Docket No. 20]
   is **GRANTED IN PART** and **DENIED IN PART** as follows:
   Count 1: Violations of the MWA is **DISMISSED**; and Count 2:
   Race and National Origin Discrimination in Violation of the
   MHRA, and Count 3: Reprisal Discrimination in Violation of
   the MHRA, **REMAIN**.

2. The parties shall appear for a settlement conference before
   United States Magistrate Judge Hildy Bowbeer on February
   24, 2016, at 9:00 a.m.  Magistrate Judge Bowbeer will issue an

order with further instructions for the parties regarding the upcoming settlement conference.


Dated:   February 8, 2016                s/ Michael J. Davis
                                                    Michael J. Davis
                                                    United States District Court